

FILED
2017 Apr-07 PM 04:23
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

| | |
|---|---|
| WILLIAM CASEY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| KIM THOMAS; JEFFERSON DUNN; | ) |
| GRANTT CULLIVER; TERRANCE G. | ) |
| MCDONNELL; GREG LOVELACE; | ) |
| CARTER DAVENPORT; DEWAYNE | ) |
| ESTES; KAREN CARTER; ERIC EVANS; | ) |
| CARL SANDERS; GARY MALONE; | ) |
| KENNETH PETERS; ANGELIA GORDY; | ) |
| WILLIAM NORTHCUTT; UNKNOWN | ) |
| SHIFT COMMANDERS; NEKETRIS | ) |
| ESTELLE; UNKNOWN HEAD OF INMATE | ) |
| CONTROL SYSTEMS; TANYA AVERY; | ) |
| PHILLIP COX; BRITTANY | ) |
| STALLWORTH; UNKNOWN INMATE | ) |
| CONTROL SYSTEMS STAFF; GEORGE | ) |
| BYNUM; UNKNOWN INVESTIGATORS; | ) |
| ED SASSER; ARNALDO MERCADO; ERIC | ) |
| BASCOMB; and UNKNOWN I&I | ) |
| SUPERVISORS; | ) |
| | ) |
| Defendants. | ) |
| | ) |
| | ) |
| | )   JURY TRIAL DEMANDED |
| | ) |
| | ) |
| | ) |

## COMPLAINT

Plaintiff complains of defendants, stating as follows:

### INTRODUCTION

1. On or about April 10, 2015, Plaintiff William Casey was brutally raped at knifepoint while imprisoned at St. Clair Correctional Facility ("St. Clair").

2.      The rape resulted from a complete breakdown of security at St. Clair, where murders, rapes, stabbings, and beatings had become routine and much of the prisoner population possessed contraband weapons.  In the four months prior to Mr. Casey's rape, at least four other prisoners had reported sexual assaults at the hands of knife-wielding assailants.

3.      The dangerous conditions that led to Plaintiff's rape were well known to Defendants.  In fact, six months earlier, the Equal Justice Initiative of Alabama had filed a 42-page class action detailing the endemic violence overtaking St. Clair and the poor leadership, mismanagement, and inadequate policies and procedures responsible for its rise. *See* Complaint, *Cheatham, et al. v. Thomas, et al.*, No. 4:14-cv-1952 (N. Dist. Ala.) (Dkt. No. 1) (hereinafter, "*Cheatham* Complaint").

4.      Defendants responded with equal and unqualified indifference to the growing security crisis, the reported sexual assaults, and the *Cheatham* litigation.  Some Defendants even fanned the flames of violence at St. Clair by encouraging assaults and arming prisoners.

5.      Defendants' apathy culminated in Mr. Casey being raped anally at knifepoint by his cellmate.

6.      Mr. Casey brings this action to redress his horrific injuries and to end the abuse perpetrated on St. Clair prisoners due to Defendants' disregard for their safety.

**JURISDICTION AND VENUE**

7.      This action is brought pursuant to 42 U.S.C. § 1983 to redress the Defendants' deprivation of Plaintiff's rights secured by the U.S. Constitution.

8.      This Court has jurisdiction of Plaintiff's federal claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction of his state law claims pursuant to 28 U.S.C. § 1367.

9.    Venue is proper under 28 U.S.C. § 1391(b), as the majority of the Defendants reside in this judicial district and the events and omissions giving rise to Plaintiff's claims occurred within this judicial district.

## PARTIES

10.    Plaintiff William Casey is a 47-year-old man serving a life with parole sentence. He was transferred to St. Clair from Limestone Correctional Facility so that he could participate in the Therapeutic Community drug treatment program.

11.    Defendants Kim Thomas and Jefferson Dunn are, respectively, the former and current Commissioners of the Alabama Department of Corrections ("ADOC"). The Commissioner is the highest ranking official in the ADOC and is responsible for the direction, supervision, and control of the Department of Corrections. Defendant Dunn undertook the role in January 2015, following Defendant Thomas's resignation.

12.    Defendant Grantt Culliver is the Associate Commissioner for Operations and Institutional Security for the ADOC, having first undertaken that role in August 2014 and returning to the position in mid-2015 after a demotion in early 2015. As Associate Commissioner, Defendant Culliver has been responsible for ensuring the effective and safe daily operations of prison facilities, including overseeing institutional security, staffing, the Classification Review Board, the Training Division, and the Transfer Division.

13.    In addition, beginning in approximately 2009 and continuing through approximately July 2015, Defendant Culliver also served as the Institutional Coordinator for the Northern Region of the ADOC. In that role, Defendant Culliver was responsible for planning, monitoring, and reviewing the day-to-day operations of correctional institutions in his assigned

area, which included St. Clair. His duties included supervising the warden of St. Clair, ensuring safe conditions at St. Clair, and leading the external security audit team.

14.     At all times relevant to this complaint, Defendant Terrance G. McDonnell was the Associate Commissioner for Plans and Programs for the ADOC. As Associate Commissioner, Defendant McDonnell was responsible for matters including the Central Records Division, Research and Planning Division, and Victim-Constituent Services.

15.     Defendant McDonnell also served in early 2015 as the interim acting Associate Commissioner of Operations. In that role, Defendant McDonnell was responsible for ensuring the effective and safe daily operations of prison facilities, including overseeing institutional security, staffing, the Classification Review Board, the Training Division, and the Transfer Division.

16.     At all times relevant to this complaint, Defendant Greg Lovelace was the Deputy Commissioner for Maintenance for the ADOC. As Deputy Commissioner, Defendant Lovelace was responsible for the maintenance and construction of correctional facilities and also had supervisory responsibility over staffing issues. Defendant Lovelace continues to hold the same position today. In this role, Defendant Lovelace participated in security improvement plan meetings for St. Clair with Defendant Culliver, the Warden of St. Clair, and others, and had ultimate responsibility for executing a security improvement plan at St. Clair.

17.     Collectively, Defendants Dunn, Thomas, Culliver, McDonnell, and Lovelace are referred to as the "Defendant Administrative Supervisors."

18.     Defendant Carter Davenport was the Warden of St. Clair from approximately 2010 to March 1, 2015, at which time Defendant Thomas transferred him to run a different ADOC prison. As Warden of St. Clair, Defendant Davenport was responsible for the day-to-day

operations of the prison, the safety and security of all prisoners at the facility, and the supervision of all subordinate employees. Defendant Davenport's responsibilities as Warden included ensuring adequate supervision and monitoring of prisoners, adequate classification of prisoners, appropriate housing assignments for prisoners, adequate staffing levels, appropriate discipline and deterrence of prisoner and staff misconduct, adherence by staff to the requirements of the Prison Rape Elimination Act ("PREA"), adherence by staff to search protocols, adequate implementation of internal security audits, and proper installation, repair, and maintenance of locks, cameras, and other security devices necessary for safety and security.

19.     Defendant Dewayne Estes was the Warden of St. Clair beginning on or about March 1, 2015. As Warden, Defendant Estes was responsible for the day-to-day operations of the prison, the safety and security of all prisoners at the facility, and the supervision of all subordinate employees. Defendant Estes' responsibilities as Warden included ensuring adequate supervision and monitoring of prisoners, adequate classification of prisoners, appropriate housing assignments for prisoners, adequate staffing levels, appropriate discipline and deterrence of prisoner and staff misconduct, adherence by staff to the requirements of PREA, adherence by staff to search protocols, adequate implementation of internal security audits, and proper installation, repair, and maintenance of locks, cameras, and other security devices necessary for safety and security.

20.     Defendant Karen Carter was an Assistant Warden at St. Clair from July 2013 through the time of the events at issue in Plaintiff's complaint.  Defendant Carter had previously worked at St. Clair as an officer from 1990 to 1998 and as a lieutenant from 2005 to 2010. Defendant Carter's monitoring and oversight responsibilities at St. Clair covered administrative duties at the facility, including PREA compliance, the Therapeutic Community substance abuse

program, the classification and housing assignment process at St. Clair, and investigations into inmate-on-inmate assaults. Defendant Carter also reviewed and approved all disciplinary and incident reports at the facility.

21.    Defendant Eric Evans was an Assistant Warden at St. Clair Correctional Facility beginning in January 2014 and continuing through the events at issue in Plaintiff's complaint. Defendant Evans' oversight responsibilities at St. Clair covered contraband searches; PREA compliance; investigations and/or reviews into prisoner and employee misconduct; prisoner movement, including to and from recreation; safety and security during certain shifts; employee rounds conducted in the segregation units; and supervision of the Segregation Captains.

22.    Defendant Carl Sanders was a Captain at St. Clair at the time of the events in Plaintiff's complaint. As Captain, Defendant Sanders was responsible for the safety of all prisoners at the Facility and the supervision of all security activities and subordinate employees. Defendant Sanders, as a Captain of General Population, was further responsible for authorizing all housing assignments at St. Clair.

23.    Defendant Gary Malone was a Captain at St. Clair at the time of the events in Plaintiff's complaint. As Captain, Defendant Malone was responsible for the safety of all prisoners at the Facility and the supervision of all security activities and subordinate employees. Defendant Malone served as a Segregation Captain through approximately July 2015, at which time he became a Captain of General Population. As a Segregation Captain, Defendant Malone's duties included ensuring the safety and security of prisoners in the Segregation Unit. As a Captain of General Population, his duties included authorizing all housing assignments at St. Clair.

24.     Defendant Kenneth Peters was a Captain at St. Clair at the time of the events at issue in Plaintiff's Complaint. As Captain, Defendant Peters was responsible for the safety of all prisoners at the Facility and the supervision of all security activities and subordinate employees. Defendant Peters also served as the PREA Compliance Manager of St. Clair at the time of Plaintiff's rape and continuing through August 2015, when Angelia Gordy took over that role.

25.     Defendant Lieutenant Angelia Gordy served from approximately 2010 or 2011 to August 2015 as the Regional PREA Coordinator for four facilities that included St. Clair. In August 2015, Defendant Gordy became the PREA Compliance Manager of St. Clair.

26.     Defendant William Northcutt was a lieutenant at St. Clair at the time of the events described in Plaintiff's complaint.

27.     Defendants Unknown Shift Commanders were the shift commanders on duty at St. Clair from December 1, 2014, through the date of the rape of Plaintiff.  The responsibilities of the shift commanders included staffing the housing units including the P Block where Plaintiff was raped, overseeing subordinates who supervised the P Block, ensuring that security checks were completed in the P Block, and investigating and evaluating requests for housing assignment changes.

28.     Defendant Neketris Estelle was the Head of Classification at St. Clair at the time of the events at issue in Plaintiff's Complaint and first began working in classification at St. Clair in 2009. As the Head of Classification, Defendant Estelle's responsibilities included conducting initial screenings; conducting semi-annual progress reviews for prisoners, attended by the warden or his designee, to review their disciplinary histories and other developments; serving on the Institutional Segregation Review Board along with the Warden and Segregation Captain; serving on the Sexual Incident Review Team; reclassifying prisoners for segregation if their

disciplinary history warranted a segregation placement; reclassifying prisoners for general population if they no longer required a segregation placement; notifying security staff of housing assignment requests; making recommendations that prisoners be transferred to protective custody; and ensuring safe housing assignments for prisoners.

29.     Defendant Unknown Head of Inmate Control Systems was responsible for housing assignments at St. Clair and for evaluating, investigating, and approving housing assignment change requests. Upon information and belief, the Head of Inmate Control Systems at the time of the events at issue in Plaintiff's complaint was Beverly Warren.

30.     Collectively, Defendants Davenport, Estes, Carter, Evans, Sanders, Malone, Gordy, Peters, Northcutt, Unknown Shift Commanders, Estelle, and Unknown Head of Inmate Control Systems are referred to as the "Defendant Facility Supervisors."

31.     Collectively, the Defendant Administrative Supervisors and the Defendant Facility Supervisors are referred to as the "Defendant Supervisors."

32.     The Defendant Supervisors acted in a supervisory capacity over other St. Clair corrections employees at all times relevant to this Complaint. Further, the constitutional injuries complained of herein were proximately caused by a pattern and practice of misconduct at St. Clair, which occurred with the consent of the Defendant Supervisors, who personally knew about, participated in, facilitated, approved, and/or condoned this pattern and practice of misconduct, or at least recklessly caused the alleged deprivation by their actions or by their deliberately indifferent failure to act.

33.     Defendants Tanya Avery (a.k.a. T. Ary), Phillip Cox, and Brittany Stallworth were classification specialists at St. Clair that worked under Defendant Estelle at the time of the events at issue in Plaintiff's complaint. As classification specialists, Defendants Avery, Cox, and

Stallworth were responsible for assisting with initial screenings, conducting semi-annual progress reviews, reclassifying prisoners for segregation or general population based on their disciplinary history, notifying security staff of housing assignment requests, making recommendations that prisoners be transferred to protective custody, and ensuring safe housing assignments for prisoners.

34.     Defendants Unknown Inmate Control Systems Staff were responsible for implementing housing assignments, ensuring safe housing assignments for prisoners, and investigating and evaluating housing assignment change requests, under the supervision of Defendant Unknown Head of Inmate Control Systems.

35.     Collectively, Defendants Estelle, Unknown Head of Inmate Control Systems, Avery, Cox, and Stallworth, and Unknown Inmate Control Systems Staff are referred to as the "Defendant Classification and Housing Administrators."

36.     Defendant George Bynum and other unknown Defendant Investigators are unknown Investigations & Intelligence Division ("I&I") investigators who conducted and/or were responsible for investigations of assaults at St. Clair at the time of the events described in Plaintiff's Complaint, including the investigation into the rape of Mr. Casey.

37.     Defendants Ed Sasser and Arnaldo Mercado were the directors of the Investigations & Intelligence Division ("I&I") at the time of the events described in Plaintiff's Complaint.  Defendants Sasser and Mercado were responsible for investigations of sexual assaults at St. Clair at the time of the events described in Plaintiff's Complaint, including the investigation of the sexual assault of Mr. Casey.

38.     Defendant Eric Bascombe was an assistant director of I&I at the time of the events described in Plaintiff's Complaint.    Defendant Bascombe was responsible for

investigations of sexual assaults at St. Clair at the time of the events described in Plaintiff's Complaint, including, on information and belief, the investigation of the sexual assault of Mr. Casey.

39.     Defendant Unknown I&I Supervisors were acting as supervisors for I&I at the time of the events described in Plaintiff's Complaint.

40.     Collectively, Defendants Bynum, Unknown Investigators, Sasser, Mercado, Bascombe, and Unknown I&I Supervisors are referred to as the "Defendant Investigators."

41.     Collectively, all of the individual Defendants are referred to as the "Individual Defendants."

42.     Plaintiff sues each of the Individual Defendants in his or her individual capacity unless otherwise noted. Each of the Individual Defendants acted under color of law and within the scope of his or her employment when engaging in the misconduct described herein.

**DEFENDANTS' FAILURE TO PROTECT MR. CASEY
FROM A KNOWN AND SUBSTANTIAL THREAT OF VIOLENCE**

**The Rape of Mr. Casey**

43.     On or about April 10, 2015, Mr. Casey was raped by his cellmate, who held a homemade knife to his neck.

44.     While in the cell, Mr. Casey had no way to contact any security staff to obtain help.

45.     Mr. Casey suffered traumatic and serious physical and emotional injuries as a result of the rape.

46.     After the rape, Mr. Casey ran out of the cell and immediately reported the assault to Defendants including Captain Peters, Warden Evans, Investigator Bynum, and Sgt. Gordy.

47.     Mr. Casey was taken to the Crisis Center in Birmingham, where he was found to have suffered an abrasion and tear to his anus.

48.     In addition, Crisis Center medical staff collected DNA evidence from Mr. Casey's person that confirmed that he had been raped.

49.     Mr. Casey suffers from medical problems with his rectum that have required him to change his underwear multiple times a day.

50.     Mr. Casey was required to sign a living agreement as the only means of avoiding placement in isolation.

51.     After the rape, Mr. Casey continued to face retaliation from friends of the assailant.

52.     Mr. Casey never received continuing mental health care and never heard the outcome of the I&I investigation.

53.     The same day he was raped, Mr. Casey reported and named his assailant, A.A., to ADOC officials.

54.     Upon information and belief, no action has been taken against the assailant.

55.     A.A.'s ADOC records demonstrate a history of violent behavior toward other inmates and ADOC staff.

56.     Prior to his transfer to St. Clair, a level 5 prison, Mr. Casey had a five-and-a-half year institutional record without allegation of violence.

57.     Mr. Casey had never done time at a level 5 prison.

58.     After completion of the drug treatment program, Mr. Casey should have been transferred back to a level 4 prison, such as Limestone Correctional Facility, from which he transferred to participate in the drug treatment program.

59.     Instead, Mr. Casey was put into general population at St. Clair and housed with an individual known to prison officials to be violent towards other inmates and staff.

60.     Defendant Classification and Housing Administrators, including Defendant Estelle, and Defendant Supervisors, including Defendants Estes, Carter, Evans, and Gordy, had responsibility for ensuring that Mr. Casey was housed appropriately and were deliberately indifferent to Mr. Casey's safety when they placed him with A.A..

61.     These defendants were also responsible for ensuring Mr. Casey treated properly as a rape victim.

62.     The Crisis Center gave discharge instructions for Mr. Casey to be tested for HIV, Hepatitis C, and Syphilis, within 24 hours.

63.     Defendants, however, did not adhere to these discharge instructions, and Mr. Casey has yet to be tested.

### The Epidemic of Violence at St. Clair

64.     Long before the rape of Mr. Casey, the Defendants were all well aware that prison rapes and assaults were an endemic problem at St. Clair.

65.     The violence at St. Clair increased sharply beginning in 2010, when Defendant Thomas first appointed Defendant Davenport to serve as the warden of St. Clair.

66.     In fiscal year 2010, the number of reported assaults at St. Clair was just 23.

67.     In each successive year, the number of reported assaults grew at an astonishing rate: to 59 in fiscal year 2011; 78 in fiscal year 2012; 101 in fiscal year 2013; 127 in fiscal year 2014; 157 in fiscal year 2015, the year in which Mr. Casey was raped; and 249 in fiscal year 2016.

68.     Six prisoners were murdered at St. Clair between 2011 and 2014 alone.

69.     The rate of assaults at St. Clair far exceeded typical levels of violence at comparable facilities across the nation.

70.     Below are examples of assaults at St. Clair in two years preceding Mr. Casey's rape:

        a.      In 2013, a prisoner was stabbed multiple times with an ice pick outside the gym by another prisoner. At the time there were approximately 200 prisoners in the area, but no officers were present to intervene in the conflict. The guards did not intervene even to render medical aid; the prisoner had to make his own way to medical staff who sent him via ambulance to an outside hospital because of the seriousness of his wounds.

        b.      In July 2013, Mark Duke was stabbed several times by another prisoner in the G-Yard and suffered a punctured lung.

        c.      In August 2013, Jammy Bell was fatally stabbed by another prisoner in the segregation unit after an officer failed to follow proper protocol for opening the cell doors.

        d.      In September 2013, Frankie Johnson was burned in his cell in the middle of the night by a prisoner who was able to exit his own cell and enter Mr. Johnson's cell to douse him with a chemical substance, heated in a microwave, in his sleep. The scalding caused severe chemical burns.

        e.      In September 2013, Allan Williams was stabbed by a prisoner, who, upon information and belief, suffered from mental illness. Upon information and belief, the man who stabbed Mr. Williams had a violent history and had stabbed another prisoner a few years earlier.

        f.      On or about November 2013, upon information and belief, Freddie James Stallworth was stabbed multiple times by another prisoner who was his cell mate. The stabbing caused serious injuries, including a punctured lung, and required surgery at a free world hospital.

Prior to the attack, Mr. Stallworth notified Lieutenant Carla Graham that he was in danger from his cell mate, and requested a move. His request was denied without adequate investigation. He was stabbed soon thereafter.

g.      In December 2013, Michael Mays was stabbed by another prisoner on the way to the chow hall. Mr. Mays was stabbed in the neck, in the back, and in the elbow. Mr. Mays had to be taken to an outside hospital for treatment.

h.      In January 2014, Marquette Cummings was stabbed and killed in the TV room, a blind spot to the assigned officer.

i.      In February 2014, a prisoner was stabbed inside his cell, a blind spot to the officer assigned to monitor his housing unit.

j.      In May 2014, Antonio Cheatham was assaulted by another prisoner in the bathroom of the H dorm, another known blind spot, while no correctional officers were in view. Part of his ear was bitten off and flushed down a toilet before any officers responded to the struggle.

k.      In May 2014, Derrick White was stabbed in the gym by another prisoner. Mr. White's assailant also stabbed another prisoner during this incident. There were approximately 20 prisoners present in the gym and 200 prisoners in the yard at the time of the stabbing. Upon information and belief, there was one officer supervising the yard and no officers present in the gym.

l.      In June 2014, Mr. White was assaulted again, this time in the hallway between P and Q blocks during a movement time by a prisoner who, upon information and belief, was not assigned to either block. There were no officers present when Mr. White was assaulted. He was strangled and then dragged while unconscious into the showers in Q. He was

14

in the showers from approximately 7:30 a.m. until 1:00 p.m. and was never found by staff, despite the fact that, upon information and belief, a count was conducted during the time he was missing.

       m.     On or about June 3, 2014, Jodey Waldrop was murdered in his cell by another prisoner, who was able to enter Mr. Waldrop's cell in the middle of the night when the block was on lockdown, when Mr. Waldrop's cell was supposed to be locked.

       n.     In July 2014, A.H. was sexually assaulted at knifepoint in his cell in M-Block by a prisoner who was not assigned to his cell. A.H. immediately reported the assault to prison staff. At the infirmary, nurses and officers laughed at A.H. while he was medically examined. A.H. reported that he was suicidal and was kept in a crisis cell for five days. He was then sent to an isolation cell in segregation in the same unit as his assailant, who threatened him. A.H. did not receive continuing mental health care and was never provided with the outcome of the I&I investigation. On information and belief, no discipline was imposed on his assailant.

       o.     In August 2014, Willie Brantley was stabbed by the same prisoner that fatally stabbed Jammy Bell in 2013, after the prisoner was assigned to clean the halls in the segregation unit. The officers failed to secure the food-tray slots on the cell doors and the assailant was able to stab the prisoner in his leg by sticking a knife attached to a broom handle through his open tray slot.

       p.     In August 2014, Victor Russo, who is 52 years old, was moved into a new block and soon after was accosted by three younger prisoners armed with knives who robbed him. When Mr. Russo reported the robbery to correctional staff, Captain Sanders suggested he get a knife to protect himself.

q.      In September 2014, Tim Duncan was murdered by another prisoner or prisoners in N-Block. Mr. Duncan had previously had conflict with individuals in N-Block and had made numerous requests to Captain Sanders to be transferred to another block. These requests were repeatedly denied.

r.      In September 2014, Joseph Royal was attacked by his cell mate soon after being transferred to P-Block in a spot that was not visible to officers. Mr. Royal was assaulted while sleeping and woke up covered in blood. He was taken to Brookwood Hospital, where he received staples in his head.

s.      In September or October 2014, Christopher Chapple was beaten over the course of several hours by multiple assailants in Q-Block. There was only a single officer in the block, a cadet, who never came out of the "cube" monitoring station during Mr. Chapple's assault, nor called for other officers to assist as the beating continued.

t.      In October 2014, prisoner Dale Gilley was assaulted in the dimly-lit tunnel leading to H-Dorm following his visit with attorneys. As Mr. Gilley entered the tunnel was punched in the face by someone Mr. Gilley could not see. Mr. Gilley reported the incident and, because he was unable to identify his assailant, was given the choice of signing a liability release form or going to an isolation cell in segregation.

u.      In November 2014, Frankie Johnson, was stabbed in the back of his head, the backs of both arms, his left side, and on one of his fingers while in the chow hall and in full view of several correctional officers. Mr. Johnson required staples to the back of his head and stitches to his finger.

v.      On or about December 3, 2014, Michael Stamper, who is 53 years old, was stabbed approximately eight times, including twice in his forehead and in his lung. Mr. Stamper received over 40 stitches and required treatment at UAB hospital.

w.      In December 2014, J.H. was sexually assaulted at knifepoint in his cell by prisoner J.D.   J.H. reported the sexual assault and indicated in his statement that J.D. had threatened to harm other prisoners at St. Clair.   Nonetheless, J.D. remained housed in general population, and just two months later, raped J.M., as described below.   J.H. never heard the results of the I&I investigation into his assault, and J.M. did not receive any discipline for the assault.

x.      In January 2015, D.C., a nonviolent offender, was raped at knifepoint in L-Block. D.C. was scared to report the rape because his assailant threatened to kill him, but decided to take action when friends of his assailant continued to harass him. D.C. was placed in an isolation cell in segregation after reporting the rape, but he still did not have sight and sound separation from his assailant. D.C. did not receive continuing mental health counseling.

y.      In January 2015, Bradley Gant was attacked as he was leaving his block during a meal time. He suffered head and facial injuries after being struck with a metal lock by an inmate who had previously harassed him. Mr. Gant required staples in the back of his head and stitches on his chin as a result of the assault. When Mr. Gant reported the earlier harassment, Captain Sanders responded that the other inmate "isn't here to take care of you," and advised Mr. Gant to "get a knife and do something about it."

z.      In January 2015, Derrick LaKeith Brown, an inmate who suffers from hemophilia, was stabbed and seriously injured by another inmate. His wounds included a punctured liver and internal bleeding that required treatment at UAB hospital.

aa.     In January 2015, Elliott Blount was robbed and stabbed in his cell in a blind spot in N-Block. Mr. Blount's assailant was assigned to P/Q and was allowed to enter an unassigned living area. Mr. Blount suffered severe head injuries that required extensive surgery at UAB hospital.

bb.     In January 2015, Justen Stinson was stabbed and punched in his cell in P-Block. After the assault, no guards were available to assist him. Instead, Mr. Stinson wandered through several other blocks seeking help for his injuries from other prisoners.

cc.     In January 2015, Micah Mays was stabbed and cut multiple times, suffering injuries to his face, wrists, neck, and shoulders during a robbery attempt in N-Block. His assailants had entered N-Block from a different block. His injuries were so severe he required treatment at UAB hospital.

dd.     On or about February 1, 2015, J.M. was raped at knifepoint by prisoner J.D., the same prisoner who had sexually assaulted J.H. in December 2014.  J.M. was raped in a blind spot in the H-Block, after repeatedly requesting a new bed assignment.  After the rape, J.M. was placed in segregation close to his assailant, who threatened J.M. for months for refusing to retract his rape complaint.  J.M. was subjected to discipline for refusing to return to general population.  He was never informed of the results of the I&I investigation into his rape.

ee.     In February 2015, Brandon Ladd was stabbed during an attempted robbery in his cell in L-Block by an inmate assigned to a different block, who was able to enter his block. Mr. Ladd suffered stab wounds to his forearm and chest, resulting in a collapsed lung, which required extensive treatment, including surgery, at UAB hospital.

ff.     In February 2015, Larry Hill was assaulted in his cell block by multiple inmates who were allowed entry into the cell block by the cube officer. Mr. Hill was beaten with knife handles and fists and knocked unconscious.

gg.     Around February 2015, Dillon Cole was stabbed multiple times in L block.

hh.     In March 2015, Jeffrey Peoples was assaulted by multiple assailants while he was sleeping in his cell.

ii.     In March 2015, David Beech, who is 58 years old, was stabbed and seriously injured by another inmate while both were waiting in the noon pill call line. The inmate stabbed Mr. Beech multiple times with a box cutter. Mr. Beech was treated at UAB hospital and received numerous staples on his wrist and several each on his head and back.

jj.     In March 2015, Nakia Echols suffered multiple stab wounds from another inmate. The inmate entered his cell in P-Block armed with a knife and ice pick in the early morning hours as Mr. Echols slept and assaulted him. Following the assault, Mr. Echols was too frightened to return to his cell and slept for a week on a bench in Q-Block, undetected by prison staff.

kk.     In March 2015, Jamal Woods was stabbed by three inmates in L-Block. Mr. Woods was stabbed in his head, face, shoulder, and leg, receiving serious injuries that required two trips to UAB hospital. The assault was in plain sight of the cube officer, the lone officer in the block overseeing 96 inmates.

ll.     In March 2015, James Dorriety was stabbed multiple times in his head and back, suffering a punctured lung. Mr. Dorriety, an honor dorm resident, was returning to his cell block from the prison canteen when three men armed with knives robbed him of his canteen

goods and assaulted him. His injuries required treatment at UAB hospital, where he received numerous staples in his head and surgery to treat his lung injury.

mm.    On April 2, 2015, M.T. was raped at knifepoint by an unknown assailant in a blind spot in a hallway between N and O Blocks.

71.    Defendants had knowledge of these violent incidents.

72.    Each of the murders at St. Clair were known to the Defendants, including Defendants Thomas, Culliver, Davenport, and Estes. The murders received media coverage that included responses from ADOC spokespersons.

73.    Also adding to Defendants' knowledge of the security crisis at St. Clair were incident reports, I&I reports, duty officer reports, disciplinary records, medical records, annual and monthly ADOC data reports, prisoner progress reports, direct observation of incidents, communications among staff, and prisoner lawsuits.

**Defendants' Failure to Address the Epidemic of Violence at St. Clair**

74.    Despite having notice of the substantial risk of violence facing prisoners at St. Clair, Defendants failed to take reasonable steps to address and reduce the risk of violence.

75.    As early as March 2012, during a state senator's tour of St. Clair, Defendant Davenport referred to weapons at St. Clair as a "security nightmare" and Defendant Thomas acknowledged that conditions at the prison were poor for prisoners. *See* Dixon Hayes, Sen. Ward, State Commissioner Tour St. Clair Prison, WBRC, *available at* http://www.wbrc.com/story/17178621/sen-ward-state-commissioner-tour-st-clair-prison.

76.    Nonetheless, Defendants Thomas and Davenport and the other Defendant Supervisors took no corrective action in 2012 or 2013 to reduce violence and improve security at St. Clair.

77.    On April 22, 2014, attorneys from the Equal Justice Initiative ("EJI") wrote Defendant Thomas regarding the alarming rise in violence and unprecedented homicide rate at St. Clair under Defendant Davenport's leadership and met with Defendant Thomas to emphasize these concerns, asking him to investigate the escalating violence at St. Clair.

78.    The Defendant Supervisors took no corrective action following the meeting, and the violence at St. Clair continued to escalate.

79.    On June 9, 2014, following the murder of yet another St. Clair prisoner, EJI counsel sent a second letter to Defendant Thomas, renewing EJI's request for the removal of Defendant Davenport and the immediate implementation of reforms. In this letter, and in subsequent meetings with Defendant Thomas and his staff, EJI counsel cited alarming facts about violence at St. Clair, noting the three homicides and more than a dozen near-fatal assaults that had taken place at the facility in the previous year. EJI attorneys also described the poor leadership by Warden Davenport responsible for the surge in violence, citing a "complete absence of accountability" and "misconduct by staff."

80.    Again, the Defendant Supervisors took no corrective action and the violence at St. Clair continued to escalate.

81.    In October 2014, shortly after the murder of another St. Clair prisoner, the Equal Justice Initiative filed a class action lawsuit on behalf of St. Clair prisoners seeking injunctive relief to reduce the violence at St. Clair. *See Cheatham* Complaint.

82.    The Equal Justice Initiative's lawsuit named as defendants Commissioner Kim Thomas, Associate Commissioner James Deloach, Associate Commissioner Terrance McDonnell, Deputy Commissioner Greg Lovelace, Institutional Coordinator Grant Culliver,

Warden Davenport, Assistant Wardens Eric Evans and Karen Carter, and Captains Carl Sanders and Gary Malone.

83.     In the *Cheatham* Complaint, the Equal Justice Initiative described in detail the history of violent assaults in St. Clair, including most of the violent incidents described above at subparts (a) to (mm) of paragraph 79.

84.     The *Cheatham* Complaint also described the policies and practices fueling the outbreak of violence at St. Clair, including the Defendant Supervisors' inadequate staffing, supervision, and monitoring of the facility, failure to fix the broken locking mechanisms at St. Clair, failure to address the widespread proliferation of contraband weapons at the facility, creation of a dangerous culture of violence and abuse, and their failure to respond appropriately to violence and rape.

85.     Each of the defendants in the *Cheatham* litigation was served with the lawsuit and on notice of the allegations therein.

86.     Yet in the aftermath of the *Cheatham* lawsuit, the Defendant Supervisors again failed to take reasonable, necessary, and appropriate steps to remedy the dangerous conditions at St. Clair. The violence at St. Clair continued to escalate.

87.     In January 2015, Defendant Dunn took over as the Commissioner of the ADOC.

88.     Shortly afterwards, Defendant Dunn received notice of the allegations in the *Cheatham* complaint and became a Defendant in the action.

89.     Defendants Dunn took no corrective actions to reduce the substantial risk of harm facing prisoners at St. Clair.

90.     In March 2015, Defendant Dunn named Defendant Estes to be the new warden of St. Clair.

91.    During Defendant Estes' leadership transition, Defendants Dunn and Culliver failed to discuss with him the violence, PREA violations, and security issues at St. Clair, or the allegations in the *Cheatham* Complaint.

92.    Nor did Defendants Dunn and Culliver instruct Defendant Estes to improve safety at St. Clair.

93.    Defendant Estes was nonetheless aware of the violence and security challenges at St. Clair through institutional reports, media reports, and his observations of the facility.

94.    In addition, shortly after assuming the warden position, Defendant Estes became a defendant in the *Cheatham* case and received notice of the allegations in the *Cheatham* Complaint.

95.    Defendant Estes, too, failed to take corrective action to improve safety at St. Clair.

96.    Upon information and belief, nearly all of the inadequate policies and procedures identified in the *Cheatham* Complaint remain in existence today. *See* Mtn. for Class Certification, *Cheatham, et al. v. Thomas, et al.*, No. 4:14-cv-1952 (N. Dist. Ala.) (Dkt. No. 93).

97.    The violence at St. Clair continues unabated. *See id.*

**Defendants' Poor Supervision and Monitoring of P Block**

98.    The Defendant Supervisors failed to promulgate, implement and enforce adequate policies, procedures, and practices necessary to adequately supervise and monitor the housing units, such as the P Block, and to maintain the safety of prisoners therein.

99.    As the Defendant Supervisors were well aware, St. Clair was both dangerously overcrowded and dangerously understaffed at the time Mr. Casey was attacked, putting prisoners such as Mr. Casey at substantial risk of harm.

100.    For example, on February 1, 2015, St. Clair had an inmate population of 1301, despite a design capacity of only 984.   On the same date, St. Clair had only 160 Assigned Correctional Officers – just 64 percent of the authorized positions to oversee 984 prisoners, let alone 1,301.

101.    Those staffing numbers translated to a prison staff/inmate ratio that was among the worst in the nation for comparable facilities.

102.    The understaffing resulted in officers having to frequently work shifts as long as 12, 16, or even 20 hours long.

103.    Chronic understaffing at St. Clair interfered with critical security functions, including supervision and monitoring of prisoners and regular, systematic, facility-wide searches for contraband.

104.    Physical assaults and robberies were common occurrences in P Block.

105.    Weapons such as knives were commonplace in P Block, as they were at St. Clair as a whole.

106.    In fact, St. Clair was widely known to be an armed facility, in that large numbers of prisoners possessed contraband weapons.

107.    Prisoners believed they needed to arm themselves at St. Clair because of endemic violence at the facility.

108.    Random patrols of the housing blocks by additional officers occurred extremely infrequently.

109.    The cube officer was the only officer monitoring the entire P Block the vast majority of the time. Upon information and belief, the officers in the cube were, at times, absent, asleep, on the telephone, or otherwise not paying attention to the prisoners they were to monitor.

24

110.    The Defendant Supervisors, including Defendants Davenport, Culliver, Lovelace, and Unknown Shift Commanders, were well aware of the acute staffing shortages and officer inattentiveness at St. Clair.

111.    These Defendants were likewise aware that the resulting inadequate supervision of prisoners created a dangerous environment that allowed and encouraged homicides and assaults such as the rape of Mr. Casey.

112.    The Defendant Supervisors further had notice of at least four security deficiencies that, when combined with understaffing and overcrowding, created a substantial risk of harm to prisoners: (1) "blind spots" in the housing areas due to limited sight lines; (2) the lack of surveillance cameras; (3) faulty locking mechanisms on the majority of cell doors; and (4) the lack of emergency call buttons in the cells to summon assistance from staff.

113.    Furthermore, as Defendants knew, when prisoners were in a cell, they had no way of contacting a security officer other than banging on their cell doors – a wholly ineffective means for getting help because security officers were frequently asleep, inattentive, absent or otherwise out of earshot.

114.    The Defendant Supervisors knew that these inadequate policies and procedures had contributed to numerous violent incidents in the years leading up to the rape of Mr. Casey.

115.    Inadequate supervision and staff presence had factored into assaults, including those of Derrick White, Justen Stinson, Christopher Chapple, and a prisoner stabbed with an ice pick in 2013.

116.    At least four St. Clair prisoners had been murdered in "blind spots" in the four years leading to Plaintiff's rape: Marquette Cummings; Jodey Waldrop; Jabari Bascomb, who was stabbed to death in October 2011 in a cell whose locked door had been "tricked" open; and

John Rutledge, who was strangled to death in May 2012 in his cell in the middle of the night when the cells should have been locked down.

117.    Blind spots had also factored into many serious and near-fatal assaults, including a February 2014 stabbing and the assaults of Antonio Cheatham, Joseph Royal, Elliot Blount, J.M., and M.T..

118.    Six full months before the rape of Mr. Casey, the Equal Justice Initiative identified these shortcomings in detail – including the overcrowding, the understaffing, the blind spots, the inadequate supervision and staff presence, and the lack of security cameras – in a complaint that was served on many of the Defendant Supervisors.

119.    Even though the Defendant Supervisors knew that their existing policies and practices were deficient and created a substantial risk of harm to prisoners, they failed to take any meaningful corrective action.

120.    Instead, the Defendant Supervisors chose to leave prisoners such as Mr. Casey exposed to a continuing risk of serious harm, exhibiting deliberate indifference to their safety.

**Defendants' Encouragement of the Widespread
Proliferation of Contraband Weapons at St. Clair**

121.    Defendants were aware of – and, in some cases, encouraged – the widespread proliferation of contraband weapons at St. Clair, exhibiting deliberate indifference to the substantial risk of harm that such weapons created to prisoners such as Mr. Casey.

122.    By the time of Mr. Casey's assault, it was a matter of common knowledge among St. Clair staff that the prisoner population at St. Clair was heavily armed.

123.    Prisoners believed they needed to arm themselves at St. Clair because of the endemic violence at the facility.

124.    Health care professionals in St. Clair's infirmary saw stab wounds on a regular basis.

125.    In the words of St. Clair Correctional Officer Jonathan Truitt, a single 24-person cell block at St. Clair could contain "30 to 40" contraband knives; contraband was "out of control"; and prisoners were being assaulted in every way imaginable." Cam Ward, Alabama Correctional Officer Numbers Down 20%, Montgomery Advertiser, Jan. 8, 2017.

126.    As set forth above, knives, box cutters, and other contraband weapons were commonly used in assaults at St. Clair, including the stabbing deaths of Marquette Cummings, Jodey Waldrop, Jammy Bell, and Jabari Bascomb and the assaults of Mark Duke, Freddie James Stallworth, Allan Williams, Michael Mays, Derrick White, A.H., Willie Brantley, Victor Russo, Frankie Johnson, Michael Stamper, J.H., D.C., Derrick LaKeith Brown, Elliott Blount, and Micah Mays, Brandon Ladd, Dillon Cole, David Beech, Nakia Echols, Jamal Woods, James Dorriety, J.M., and M.T.

127.    In its October 2014 lawsuit, the Equal Justice Initiative brought to Defendants' attention the widespread availability of weapons contraband at the facility, providing numerous examples of stabbings and other violent incidents that had occurred at St. Clair during Defendant Davenport's tenure as warden.

128.    The Defendant Supervisors, including Defendants Thomas, Culliver, Davenport, Estes, Sanders, and Malone, did nothing to curtail the widespread availability of contraband weapons at St. Clair, exhibiting deliberate indifference to prisoners such as Mr. Casey who were likely to be victimized by such weapons.

129.    Instead, the Defendant Supervisors fostered and enabled the accumulation of weapons through at least three policies and practices: (a) the encouragement of violence; (b) inadequate search procedures; and (c) inappropriate responses when weapons were recovered.

130.    Warden Davenport and Captain Sanders directly encouraged prisoners commit assaults and Defendant Sanders even personally armed them. For example:

a.    Upon information and belief, Defendant Sanders taunted prisoners and responded to their safety concerns by telling them to, "get a knife," "kill him or kill yourself," and "if you really don't like him, stab him."

b.    Robert Woods was reassigned by Defendant Sanders to a violent block where he was vulnerable because of his advanced age at the time and physical disability. When he expressed fear for his safety to Defendant Sanders, Sanders responded "If you ain't got a knife, I'll give you one." When Mr. Woods reported a subsequent theft to Defendant Sanders, Sanders responded that he had moved Mr. Woods so that something like that would happen to him. When Mr. Woods informed Defendant Davenport about Defendant Sanders' comments, Defendant Davenport asked Mr. Woods if he had a knife yet and told Mr. Woods to do what he needed to do to survive on his new block. Mr. Woods made one final request to Defendant Sanders to move him from his new block and Defendant Sanders responded by placing several box cutters on a table and telling Mr. Woods to take a knife to protect himself.

c.    In August 2014, in response to learning that prisoner Victor Russo had been accosted and robbed, Defendant Sanders suggested that Russo get a knife to protect himself.

d.    In January 2015, Defendant Sanders told prisoner Bradley Gant to "get a knife and do something about it" when Gant reported that he was being harassed by a prisoner.

28

131.    As the Defendant Supervisors were well aware, their deficient search procedures, too, promoted and enabled the accumulation of contraband weapons at St. Clair.

132.    Security staff at St. Clair did not regularly conduct facility-wide searches and other standard prison search protocols and procedures to root out contraband.

133.    Defendant Supervisors, including Warden Davenport, Warden Estes, Assistant Warden Evans, and the Defendant Unknown Shift Supervisors turned a blind eye to noncompliance with search protocols at St. Clair.

134.    Defendant Davenport further chose not to even conduct any internal security audits of St. Clair's compliance with search protocols and the level of safety in the institution.

135.    In October 2014, an external security audit of St. Clair confirmed that St. Clair was noncompliant in its search protocols for contraband, including weapons.

136.    The security audit was submitted to Defendant Culliver and discussed with Defendant Supervisors including Defendant Davenport.

137.    Nonetheless, the Defendant Supervisors took no corrective action.

138.    Furthermore, when the Defendant Facility Supervisors recovered weapons from prisoners, they responded with indifference, often declining to discipline prisoners found with knives.

139.    The failure to discipline the possession of weapons created a dangerous culture whereby prisoners knew they could possess weapons with impunity and felt emboldened  to use those weapons without fear of incurring any disciplinary citations.

140.    As but two examples, Defendant Peters recovered a knife from J.M.'s assailant, J.D., in February 2015, but J.D. was not disciplined for the incident. On information and belief,

Defendant Northcutt recovered another knife from J.D. in September 2015, and again, Defendants failed to impose any discipline on J.D.

141.   Even in the aftermath of the *Cheatham* litigation, the Defendant Supervisors made no meaningful attempt to address contraband weapons at St. Clair, exhibiting deliberate indifference to the resulting substantial risk of harm created for prisoners such as Mr. Casey who would fall victim to those weapons.

**Defendants' Creation of a Culture of Abuse and Violence at St. Clair**

142.   Defendants also fueled a culture of violence at St. Clair by engaging in violence themselves, tolerating and condoning violence by staff members, and failing to discipline prisoners for violent acts.

143.   As set forth above, Defendants Davenport and Sanders encouraged prisoners to stab and fight with one another.

144.   Defendants Davenport, Malone, and Sanders also regularly victimized prisoners. For example:

a.   In 2012, Defendant Davenport punched a handcuffed prisoner in the face. The incident was not investigated, and the Defendant Administrative Supervisors did not strip Defendant Davenport of his command or demote him.

b.   On or about December 3, 2014, Defendant Malone assaulted prisoner Marcus Webb while Webb was handcuffed in the infirmary. Mr. Webb suffered head and arm injuries as a result of this assault.

c.   That same year, Defendant Malone punched a handcuffed prisoner in the head, chipping the prisoner's tooth.

d.     For three days and two nights in October 2014, prison staff forced prisoner Antonio Cheatham to stand outside the shift office because the prison staff refused to place Mr. Cheatham in safe housing. The situation began on or around October 3, when Defendant Sanders ordered Mr. Cheatham to move to L-Block. Mr. Cheatham, who had recently had part of his ear bitten off by another inmate, told Captain Sanders that he had documented enemies in L-Block and could not live there. Captain Sanders responded by telling Mr. Cheatham he could either move to L-Block or stand outside the shift office all night. Mr. Cheatham remained there for approximately three days and two nights before being sent to an isolation cell in segregation.

145.     In addition, the Defendants Supervisors, including Warden Davenport and his designees, refused to discipline correctional officers for using excessive force against prisoners, even when those officers had a history of abusive behavior. For example:

a.     Upon information and belief, in January 2012, St. John Mason beat inmate Joseph Shack, who suffered hearing loss as a result. Mr. Shack had requested the presence of a witness at a disciplinary hearing, and Sgt. Mason responded: "This is what I do to a [n . . . ] that tries to tell me how to do my job" and proceeded to punch him in the head, face, and ear; stomp on his back; kick him; and yell racial epithets at him, all while Mr. Shack was handcuffed and shackled. Mr. Shack was treated for a ruptured ear, fractured thumb, and internal bleeding. He was fitted for a hearing aid following the rupture.

b.     Upon information and belief, Officer Matthew Moore beat inmate Darrious Mabry in October 2012. In a dispute over Mr. Mabry leaving the dining hall with extra cake, Officer Moore left his post and attacked Mr. Mabry, who suffered a broken nose, split lip, broken tooth, injured eye, and head contusions.

c.      Upon information and belief, multiple St. Clair officers beat prisoner Richard Eason while he was handcuffed in February 2013. The officers assaulted Mr. Eason in the segregation unit, after he had been placed in handcuffs so he could leave his cell for a shower. Officer JaMichael Howard left his post and approached Mr. Eason, asked him a question, then punched Mr. Eason several times in the face. Officers Taylor Knight and Chad Cleveland then assisted Howard in slamming Mr. Eason onto the floor.

d.      Officers Chad Cleveland, M. Desnides, and W. Howard assaulted prisoner Jermaine Tillman in February 2013. The officers assaulted Mr. Tillman when he was returning to his cell from the showers and was restrained in handcuffs behind his back. The officers hit Mr. Tillman in the face, slammed his head into a window, and continued to punch, kick, and beat him when he fell to the floor.

e.      In May 2014, Lieutenant Carter forced Dale Gilley to stand outside the shift office facing the wall for fourteen hours and, at one point during that period of time, slammed his head against the wall and punched him in the face.

f.      In May 2014, Lieutenant Carter put his hands around an inmate's neck and applied pressure until he lost consciousness. The inmate had to be taken to UAB hospital due to his injuries.

g.      In July 2014, Correctional Officers Donald Lukima and Christopher Smith, officers on Lieutenant Carter's shift, assaulted a prisoner. Officers Lukima and Smith ordered the prisoner out of his cell in the middle of the night, took him into the hallway outside his block, handcuffed him, and then hit him in the back of the head with handcuffs wrapped around their knuckles, causing injuries requiring staples.

h.      In March 2014, inmate Tommy Demming observed Officer Bryan Chapman assaulting a handcuffed inmate. When Mr. Demming verbally intervened, Officer Chapman opened the door to his cage and punched him three times in the head. Mr. Demming was handcuffed while he was assaulted.

i.      In June 2014, an officer assaulted inmate Demetric Pritchett multiple times in the head and face while Mr. Pritchett was restrained. The final assault occurred at the orders of Defendant Malone.

j.      On or about August 4, 2014, Officer Chad Cleveland and Defendant Truitt sprayed Charlie Bennett with chemical spray and paraded him through the prison naked. Officer Cleveland had entered Mr. Bennett's cell and ordered him to strip, squat and cough, an order Mr. Bennett complied with. No contraband was found, yet Officer Cleveland ordered him to squat and cough again. Mr. Bennett again complied and again no contraband was found. The third time Officer Cleveland ordered him to squat and cough, Mr. Bennett refused, believing another search was excessive. Officer Cleveland and Defendant Truitt then sprayed him with chemical spray and walked him naked through the camp, declining to provide him with proper medical treatment to remove the chemical from his eyes and face.

k.      On or about September 3, 2014, Officer Daniel Turner assaulted Michael Nelson, a partially-paralyzed stroke victim who relies on a wheelchair, following a disagreement over a clothesline that Mr. Nelson used near his bunk in a medical dorm. Officer Turner cursed at Mr. Nelson, threatened to kill him, and repeatedly punched him in the face and chest. Officer Turner pushed Mr. Nelson in his wheelchair into a bathroom area, where he threw Mr. Nelson and the wheelchair into a wall and forced Mr. Nelson onto the floor, destroying his wheelchair.

l.    In September 2014, Officer Burns assaulted Arlo Townsend while Mr. Townsend wore handcuffs, after which Mr. Townsend was sprayed with a chemical agent. Lieutenant Ronald Carter accompanied Mr. Townsend to the infirmary, where Lieutenant Carter inflicted a second beating on the handcuffed Mr. Townsend, which resulted in severe injuries to his jaw, mouth, and teeth.

m.    On or about October 6, 2014, Officer Lauolefiso Jones assaulted prisoner Terrence Seay in the barbershop while Mr. Seay wore handcuffs and leg shackles. Officer Jones punched Mr. Seay, throwing him to the ground, then stomped on him and struck him with a broom handle.

n.    In October 2014, Officer Lauolefiso Jones beat and cursed at Jamie Abrams, at the time a resident of the honor dorm. Officer Jones grabbed Mr. Abrams by the neck and slammed his head against a wall. The assault was the result of Mr. Abrams' mistakenly sitting at the wrong table during a Kairos religious program at the prison.

o.    In October 2014, Officer Lauolefiso Jones entered Matthew Owens' cell after the Kairos program, grabbed Mr. Owens by the neck and slammed his head into his bunk several times. Mr. Owens nearly passed out while being choked. Officer Jones also threatened to kill him and shouted numerous profanities at him.

p.    In October 2014, officers in the segregation unit restrained and assaulted Joseph Royal, upon an instruction from Defendant Malone to beat him.

q.    In November 2014, Officer Padgett shoved Tommy Demming into a wall and punched him in the face, while Mr. Denning was handcuffed.

r.    On or about November 3, 2014, Officer Lauolefiso Jones assaulted prisoner James Howard while he was walking to the chow hall. Officer Jones grabbed the front

of Mr. Howard's shirt, picked him up, and slammed him into the ground. Officer Jones then rolled him over, handcuffed him, and kicked him while he was handcuffed. Officer Jones shouted homophobic slurs during the assault.

s.      On or about December 7, 2014, two officers assaulted Antonio Johnson when he attempted to eat in the chow hall without his identification. Mr. Johnson tried to explain his lack of identification but was ordered to go to the shift office. As he was complying with the order, Officer Burke punched him multiple times in the face. A second officer, Officer Bowman, approached and the two officers forced Mr. Johnson to the ground and kicked him in the head.

t.      In December 2014, four officers in the infirmary assaulted Larry Nesbitt, who was undergoing an evaluation for a toothache and high blood pressure. Officers Howard Jr., Williams, Suggs, and Howard Sr. ordered nurses to leave the room, then slapped and punched Mr. Nesbitt, who was handcuffed throughout the assault.

u.      On January 3, 2015, officers beat Shakil Gamble and ordered him to the shift office where he was directed to stand facing the wall. While Mr. Gamble was standing with his hands against the wall, Officer Tolliver repeatedly slammed his head into the wall. Additional officers entered the shift office, including Lieutenant Carter. Officers began to beat Mr. Gamble and strike him with their batons. Mr. Gamble's head was also slammed against the floor.

v.      Upon information and belief, in January 2015, officers in the L-Block body-slammed Zendarius White after he asked why the officers were harassing other prisoners.

w.      In January 2015, multiple officers assaulted Justin Jackson by punching him, slamming him to the ground, kicking him, and striking him with their batons, all while he was handcuffed. The officers dragged Mr. Jackson to the infirmary, where the assault continued until Mr. Jackson was locked in a temporary holding cage. Sergeant Cook approached him in the

cage, then called Officer Howard who began to beat Mr. Jackson again, all while Mr. Jackson remained handcuffed. Howard and Cook also struck Mr. Jackson with their batons.

x.     On or about February 3, 2015, two officers assaulted handcuffed prisoner Demetric Pritchett. Mr. Pritchett had requested to see a supervisor regarding threats he was receiving from other men in the segregation cell block. Officers Jason Schmid and Patton escorted him outside his cell and to a hallway, where they repeatedly punched him in the face.

146.   The Defendant Supervisors were aware of the incidents identified above through internal reports, including use of force reports, incident reports, duty officer reports, medical reports, and through external sources such as the *Cheatam* Complaint.

147.   On information and belief, none of the officers received meaningful discipline for the abuses detailed above.

148.   The failure to discipline officers for excessive force and other misconduct signaled to the correctional officers at St. Clair that they could abuse, or fail to protect, prisoners without fear of any adverse consequences.

149.   The failure to discipline officers for excessive force and other misconduct signaled to prisoners at St. Clair that they could abuse other prisoners without fear of any adverse consequences.

150.   Defendants, including Defendants Davenport, Estes, Carter, and Evans also failed to properly investigate and discipline acts of violence by prisoners, emboldening violent prisoners such as Mr. Casey's assailant.

151.   Defendants' conduct created a dangerous culture of violence at St. Clair, which, in turn, heightened the risk of inmate assaults on vulnerable prisoners such as Mr. Casey.

152.    The Defendant Supervisors were put on notice of the culture of abuse and violence at St. Clair through their participation in it, their roles at St. Clair and ADOC, internal ADOC reports, communications with staff and prisoners, prisoner lawsuits, and media coverage.

153.    The Defendant Supervisors were also put on notice of this culture through the Equal Justice Initiative's *Cheatham* Complaint, which described in detail the ways in which Defendants fostered and encouraged a culture of abuse and violence at St. Clair and the resulting risks to prisoners.

154.    Nonetheless, with deliberate indifference to a substantial risk of harm to prisoners such as Mr. Casey, the Defendant Supervisors failed to address or curb the culture of violence that they themselves had created, perpetuated, and condoned.

### Defendants' Failure to Adequately Prevent, Detect, and Respond to Prior Instances of Sexual Abuse at St. Clair

155.    At the time of Mr. Casey's rape, the Defendant Supervisors were aware of the high rate of reported incidents of sexual violence at St. Clair, including the attacks of J.H., D.C., A.H., J.M., and M.T. described above, all of which took place between December 2014 and April 2015.

156.    The Defendant Supervisors were also aware that numerous sexual assaults at St. Clair had gone unreported.

157.    The Defendant Supervisors likewise knew at the time of Mr. Casey's rape that St. Clair's policies and procedures, including the enabling of weapons contraband, creation of a culture of violence, understaffing, overcrowding, inadequate supervision and monitoring, dangerous housing assignments, and the failure to discipline instances of prisoner or staff misconduct, created an unnecessary and serious risk of sexual abuse to vulnerable prisoners.

158.   In 2013, the Equal Justice Initiative issued a report about sexual violence in ADOC prisons and met with Defendant Thomas to discuss the policies and practices that contributed to such violence, urging ADOC to take steps to protect its prisoners from sexual assault.

159.   The Equal Justice Initiative's *Cheatham* Complaint further put the Defendant Supervisors on notice of the prevalence of sexual assault at St. Clair.

160.   The Defendant Supervisors were also well aware of their obligations to address sexual abuse at St. Clair to reduce the substantial risk of harm to prisoners such as Mr. Casey.

161.   A 2001 study published by Human Rights Watch ("HRW") reported on the pervasive problem of inmate-on-inmate rape in prisons throughout the United States. See Human Rights Watch, No Escape: Male Rape in U.S. Prisons, April 2001 (available at http://fl1.findlaw.com/news.findlaw.com/cnn/docs/hrw/hrwmalerape0401.pdf). The HRW report found that "rape and other sexual abuses occur in prison because correctional officials . . . do little to stop them from occurring," including by failing to supervise and monitor prisoners, eliminate "blind spots," employ adequate staffing levels, rapidly and effectively respond to complaints of rape, and properly classify prisoners. *Id.* at 14-15.

162.   In 2003, on the heels of the HRW report, Congress passed the Prison Rape Elimination Act of 2003, cautioning that "[s]tates that do not take basic steps to abate prison rape" demonstrate deliberate indifference to prisoners' constitutional rights. 42 U.S.C. § 15601(13).

163.   The PREA Act, in turn, established a body known as the National Prison Rape Elimination Commission ("NPREC") to investigate prison rape. NPREC's 2009 report found that: "Sexual abuse is not an inevitable feature of incarceration. Leadership matters because

corrections administrators can create a culture within facilities that promotes safety instead of one that tolerates abuse." National Prison Rape Elimination Commission Report, June 2009, at 5 (available at https://www.ncjrs.gov/pdffiles1/226680.pdf). The NPREC report, too, issued findings on the importance of proper classification, supervision, staffing, and responses to complaints of rape. *Id.* at 5-8.

164.    PREA also resulted in the 2011 promulgation of the National PREA Standards, which imposed requirements on correctional facilities in such areas as supervision and monitoring, screening for risk of victimization and abusiveness, proper official responses following an inmate report of sexual assault, and disciplinary sanctions for perpetrators. *See* 28 C.F.R. § 115.11 - 115.18 (standards for adult prisons and jails).

165.    Defendants were familiar with PREA, the PREA National Standards, their obligation to protect prisoners from sexual assault, and ADOC's 2014 PREA policy.

166.    Nonetheless, the Defendant Supervisors, Defendant Investigators, and Defendant Classification and Housing Administrators were deliberately indifferent to the serious risk of harm that sexual violence posed to prisoners such as Mr. Casey.

167.    These Defendants – including Defendants Dunn, Thomas, Culliver, Davenport, Estes, Carter, Evans, Peters, Gordy, Estelle, Sasser, Mercado, and Bynum – failed to take reasonable steps to protect prisoners such as Mr. Casey from a substantial risk of sexual assault.

168.    The Defendant Supervisors continued and maintained general policies and practices that heightened the risk of sexual assault, including understaffing, inadequate supervision, deficient security, inadequate search procedures to eliminate weapons contraband, and encouragement of violence, as described more fully above.

169.    In addition, the Defendant Supervisors, Defendant Classification and Housing Administrators, and Defendant Investigators – including Defendants Davenport, Estes, Gordy, Peters, Carter, Sanders, Estelle, and Head of Inmate Control Systems – had an unreasonable and longstanding policy and practice of failing to identify known or likely perpetrators of sexual assault to ensure the safety of other prisoners at St. Clair.

170.    Defendants failed to adequately and effectively separate predatory prisoners even though they knew that the failure to do so had contributed to violence in the past, such as the assaults of Allan Williams and Willie Brantley.

171.    For example, J.D. was known to Defendants to be a sexual assault perpetrator with a long history of disciplinary infractions, including an attempted rape in December 2014. Nonetheless, the Defendant Classification and Housing Administrators, along with Defendants Davenport, Gordy, Carter, Evans, Peters, and Sanders, chose to house J.D. in a dormitory alongside vulnerable prisoners such as J.M.

172.    At the time of the rape of Mr. Casey, none of the Defendant Supervisors even tracked instances of sexual assault or required that reports be created regarding their frequency or participants therein.

173.    The Defendant Supervisors and Defendant Investigators, including Defendants Carter, Evans, Peters, and Gordy, did not thoroughly investigate sexual assault complaints, failed to notify victims of the results of I&I investigations, and failed to discipline prisoners for sexual assaults.

174.    On information and belief, Defendants also failed to discipline the perpetrators of the sexual assaults of A.H., J.H., J.M., and M.T.

175.    These failures emboldened sexual assault perpetrators at St. Clair, leading them to understand that they could assault other prisoners with impunity, and creating a substantial risk of harm to prisoners such as Mr. Casey.

176.    The Defendant Supervisors and Defendant Investigators also encouraged, condoned, and facilitated sexual assault through harsh and retaliatory responses to prisoners who reported sexual abuse.

177.    The Defendant Supervisors, including Defendants Thomas, Dunn, Culliver, McDonnell, Davenport, and Estes, did not implement any protective custody at St. Clair or transfer St. Clair prisoners to protective custody at other ADOC facilities. Instead, they placed prisoners reporting sexual abuse in the restrictive environment of isolation cells in segregation. This punitive housing assignment discouraged prisoner reports of sexual abuse and heightened the risk to prisoners such as Mr. Casey.

178.    The Defendant Supervisors and Defendant Investigators, including Defendants Gordy, Carter, Evans, and Peters, likewise did not protect victims from retaliation, including by providing sight and sound separation between the victims and their assailants and by protecting victims from gang associates of their assailants.

179.    For those prisoners courageous enough to report their rape at St. Clair, retaliation frequently followed. As described above, A.H., D.C., J.M., and M.T. all endured retaliation from their assailants and the Defendant Supervisors – including Defendants Gordy, Carter, Evans, and Peters – took no meaningful steps to prevent or address this retaliation.

180.    The Defendant Supervisors and Defendant Investigators, including Defendants Gordy, Carter, Evans, and Peters, also regularly declined to provide sexual assault victims with

mental health treatment, proper forensic medical examinations, adequate post-incident medical care, or testing for sexually-transmitted infections.

181.    In addition, the Defendant Supervisors permitted correctional officers at St. Clair to regularly make light of sexual violence without incurring any discipline. For example, Sergeant Jacob Hamilton wrote in a social media post on Facebook words to the effect of: "Surprise sex is the best thing to wake up to. Unless you're in prison." He added: "Funny shit." Likewise, Officer Adam Shankles posted an image on social media of a large rectal opening, with words to the effect of: "This is your butthole in prison – don't shoplift."

182.    Upon information and belief, the Defendant Facility Supervisors failed to discipline or counsel Sergeant Hamilton or Officer Shankles regarding these comments, even after they were brought to the Defendant Supervisors' attention in the *Cheatham* litigation and even though the officers had represented themselves as staff from St. Clair in their social media posts.

183.    Defendants' failure to properly prevent or respond to incidents of sexual assault emboldened perpetrators and heightened the risk of harm to prisoners such as Mr. Casey.

184.    Despite the prevalence of sexual assault at St. Clair prior to Mr. Casey's rape, and their knowledge of the same, the Defendant Supervisors, Defendant Classification and Housing Administrators, and Defendant Investigators failed to implement any corrective action to reduce the risk of harm to prisoners such as Mr. Casey, exhibiting deliberate indifference to their safety.

185.    Because St. Clair has no grievance system, the grievance-related provisions of the PLRA do not apply to Plaintiff.

## PLAINTIFF'S DAMAGES

186.    As a result of the Defendants' wrongful actions, Plaintiff has suffered severe physical and emotional trauma and injuries.

## CLAIMS

### Count I - 42 U.S.C § 1983
### Eighth Amendment Failure to Protect
### Against All Defendants

187.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

188.    Pursuant to the Eighth Amendment of the United States Constitution, Plaintiff is entitled to be free from a known and unreasonable risk of serious harm while in the custody of the State.

189.    Defendants, acting individually and in conspiracy with other Defendants, failed to protect Plaintiff.

190.    Defendants knew of and consciously disregarded the substantial risk that Plaintiff would be injured while in custody at St. Clair, failing to protect him from harm.

191.    Additionally, Defendants knew of and consciously disregarded the substantial risk that a known or likely perpetrator of sexually assault would harm prisoners like Plaintiff while in custody at St. Clair, and failed to take any action in response.

192.    The misconduct described in this Count was undertaken with deliberate indifference, malice, willfulness, and/or reckless indifference to the rights of Mr. Casey and others, and was objectivelyunreasonable.

193.    Defendants' misconduct directly and proximately caused Mr. Casey to be subjected to an unreasonable risk of serious harm, and caused him to suffer damages, including pain, suffering, fear, anxiety, rage, and other harmful physical and psychological harms, both from the brutal rape and its devastating aftermath.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

<u>s/ Henry F. (Hank) Sherrod III</u>
Henry F. (Hank) Sherrod III
No. ASB-1200-D63H
HENRY F. SHERROD III, P.C.
119 South Court Street
Florence, Alabama 35630
Phone: 256-764-4141
Fax: 877-684-0802
Email: hank@alcivilrights.com

ALAN B. LASSETER
LASSETER LAW FIRM, P.C.
2100 Morris Avenue
Birmingham, AL 35203
Telephone:  (205)322-1411
Email: alan@lasseterlaw.com

Attorneys for Plaintiff